F. MERGES & CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 11640, 12438. Promulgated April 9, 1928.

*Allen G. Gartner, Esq.*, for the petitioner.
*Shelby S. Faulkner, Esq.*, and *C. R. Marshall, Esq.*, for the respondent.

**448**

OPINION.

SMITH: The petitioner contends that for the years 1918 to 1921, inclusive, it was a personal service corporation within the meaning of section 200 of the Revenue Acts of 1918 and 1921. This is denied on behalf of the respondent upon two grounds (1) that the income produced by the petitioner was not ascribable primarily to the activities of the stockholders, and (2) that capital was a material income-producing factor. In the opinion of the Board the petitioner otherwise meets the requirements of the statute with respect to a personal service corporation. Therefore, only the objections raised thereto by the respondent will be considered.

The petitioner also contends that it is entitled to deduct from gross income of each of the years 1918 and 1919, $12,000 as a " reserve for unearned commissions."

1. The petitioner was the local and general agent of several large fire insurance companies and the exclusive territory covered by the contracts with these companies extended over the entire State of New York in the case of the companies which it represented as general agent, and the greater part of New York City in the case of two companies which it represented as local agent. All this territory was thickly populated. There were 300 or more local agents throughout the State of New York who reported their business to the petitioner and the petitioner passed upon the risks secured by such local agents. For the doing of this work the petitioner received an over-

writing commission from the two companies which it represented as general agent. It is the contention of the respondent that this business written by the local agents passing through the office of the petitioner, and upon which it received a commission, was not primarily produced by the stockholders or officers of the corporation but by these special agents themselves; that it would be practically impossible for F. Merges to cover this large and thickly populated territory; that the testimony discloses that F. Merges visited these agents not to exceed five or six times a year.

We can not doubt from the evidence that the contracts secured by the petitioner with the insurance companies were based upon the efforts of F. Merges individually. He was the surviving partner of the partnership of Whiton & Merges and correspondence produced in evidence warrants the conclusion that the insurance companies dealt with the petitioner by reason of the personal qualifications of F. Merges.

The petitioner was a one-man corporation. Merges owned all of the capital stock. The petitioner held no directors' meetings and Merges did not consult with anybody upon business policies. He laid down rules to govern the business of the corporation and saw to it that those rules were carried out. Any risks of an unusual nature taken by the local agents were called to Merges' personal attention. He approved or disapproved of the risks and if he disapproved of the risk the policy was immediately canceled. One of the principal employees of the petitioner was requested at the hearing to state the nature of the service performed by Merges. He answered:

A. All right. Take, for instance, if the company had to write millinery stock, which is very susceptible to damage by fire, water or smoke, although they might be willing to write that risk, if Mr. Merges' judgment was that it was too risky, he would say, " I do not want to write any insurance on millinery stocks; I do not want you to take it without my approval." And it would not be written without having his approval. In that case, we would have to take that particular risk, or anything bearing a risk of that nature, to him, and it may be so with other businesses. Take the celluloid business, or a paper box factory and a risk of that hazardous nature. He would insist upon his approval or his authorization being given.

He was further asked:

Q. Is there any other service that you can think of that F. Merges & Company might perform for either the insurance companies or the clients? Tell us in your own words, if you can. I am trying to get a description of the business as it was carried on there from all angles. Tell us in your own words, if you can.

A. Well, when a risk would be submitted to our accountant, we would check it up, as regards, as I said a moment ago, seeing whether we had any liability in that particular location, what the character of the surrounding buildings was,

and then it went through the fire record to see whether it was a man who had a fire record or had fires at any time, and also whether he had a commercial rating. If he had not a commercial rating, we would send for a Dun report or a commercial report. There were times when the report was not satisfactory, and there were other channels by which we could get other information concerning that particular assured. Then, we would communicate with the New York Board and find out if they had anything in connection with the particular risk, and after going through those various checks, the policy then would be written up, delivered to the broker, and when the premium became due it would be collected. If the premium was not paid when due, cancellation notices were sent out by registered mail. We then had to see that the policy was gotten back from the assured, if it were possible to do so, or get a release, or if the party had moved, we would have to send a man there and have him make an affidavit that he visited the premises and made a diligent search and could not find that he had any property in the building. That would enable us then to cancel off the risk.

The same witness was also requested to state the work that F. Merges did for the benefit of the insurance companies the petitioner represented. He replied:

A. He would always be on the lookout to inquire as to the changed conditions in different localities. For instance, there might be in certain parts of Long Island a large frame center or development, and he would then advise the companies to reduce the obligations there, or give us instructions that we should not accept liability in that particular neighborhood. In other parts he might discover that the water supply was deficient. In that case, he would go over his maps to see whether a company's liability was beyond what he would think it should be, in his judgment. In other sections, owing to the character of the neighborhood or the changing character of that neighborhood, he would say, " Don't write any more for our particular companies in that locality."

With respect to the direct business, it is in evidence that F. Merges was the only solicitor for the petitioner. He had a large business and social acquaintance, and the direct business and the brokerage business were secured by the petitioner through those relationships.

With respect to the contention of the respondent that the income of the petitioner was ascribable primarily to the activities of local agents and not to the activities of F. Merges, it should be noted that the insurance companies which the petitioner represented as general agent allowed the local agents a commission upon the business produced and, in addition, allowed the petitioner an overwriting commission. The commission allowed the local agents was to compensate them for their services in obtaining the risks in the first instance. The overwriting commission allowed the petitioner was to compensate it for passing upon the risks and supervising the work of the local agents. It was allowed the petitioner for personal services performed by F. Merges and his employees. F. Merges supervised and directed the entire work of the agency. Although the details of the services rendered the insurance companies by the petitioner were in large part performed by employees those services were performed

under the personal direction of F. Merges. We can not doubt from the record that the overwriting commissions from the agency business were primarily ascribable to the activities of F. Merges. The record is equally clear that the commissions earned on the direct business were primarily ascribable to Merges' activities.

The facts in this case are not essentially different from those which obtained in the case of *Harry S. Kaufman, Ltd.* v. *Commissioner*, 24 Fed. (2d) 44, in which the insurance agency was held to be a personal service corporation, or from those which obtained in the case of *Hurst, Anthony & Watkins, Inc.*, v. *Heiner*, 26 Fed. (2d) 734, decided by the District Court of the United States for the Western District of Pennsylvania.

2. The respondent also contends that the record in this case warrants the conclusion that capital was a material income-producing factor. He submits that the fact that premiums were not remitted by the local agents for 60 to 90 days and the petitioner had to remit the premiums within 75 to 90 days before it received its commission would apparently require the need of capital for a successful business and that the large amounts of accounts receivable and payable disclose the need of capital in the petitioner's business. We are of the opinion that this is incorrect. The only paid-in capital of the corporation was $10,000, which was apparently all paid out by the petitioner prior to the taxable year in the acquirement of the business from Whiton. The company had a considerable cash balance at the close of each of the taxable years under review, but it does not appear that this cash balance was necessary for the conduct of the business. In the ordinary operation of the business premiums were received from the local agents and from the insured prior to the time they were required to be paid over to the insurance companies. The only income of the company directly ascribable to capital was interest on bank balances as follows:

| | |
|---|---|
| 1918 | $1,690.99 |
| 1919 | 3,001.26 |
| 1920 | 4,640.69 |
| 1921 | 3,271.76 |

The amount of this interest for each year was a negligible part of the total gross income of the petitioner. In *Hubbard-Ragsdale Co.* v. *Dean*, 15 Fed. (2d) 410, the subject of the use of capital in a personal service corporation is discussed at length. Quoting from the opinion we find the subject set out as follows:

\* \* \* It is necessary to consider the kind of service rendered by the corporation, as assisting in the determination of whether the use of capital ordinarily plays an important part in rendering such service, and then to consider whether, in the particular case under consideration, the use of capital was necessary, and whether it was in fact used. Holmes, Federal Taxes (6th Ed.)

p. 191. If capital was not in fact used, it is manifest that it was not necessary, but only incidental. If capital was used, the inquiry is whether such use was vital and necessary to the conduct of the business, or merely an incidental convenience for more orderly fiscal operation.

We are of the opinion that in the instant case capital was not a material income-producing factor in the production of the income of the petitioner during the taxable years.

3. In view of our decision that the petitioner was a personal service corporation for the years 1918 to 1921, inclusive, it becomes unnecessary to determine the deductibility from gross income of each of the years 1918 and 1919 of $12,000 " reserve for unearned commissions."

Reviewed by the Board.

*Judgment of no deficiency will be entered.*